TAYLOR et al. v. GOODRICH TIRE & RUBBER CO. et al.—98 S. W. (2d) 1094.

Middle Section.   July 20, 1935.

Petition for rehearing denied November 15, 1935.

Petition for Certiorari denied by Supreme Court, December 4, 1936.

354

R. S. Hopkins, of Columbia, for appellant Universal Credit Co.
J. Shelby Coffey, of Columbia, for appellee Maury Nat. Bank.

FAW, P. J.   The original bill in this case was filed on October
9, 1931, and on October 10, 1931, it was sustained by the chancery

court as a general creditors' bill to inure to the benefit of all creditors of Fry Brothers (an insolvent corporation), "who may claim its benefits or come in under it."

A receiver of the assets of the insolvent corporation was appointed, and the usual order appropriate to such cases was made, enjoining the institution of separate suits against the insolvent corporation, ordering publication for creditors to file their claims on or before a named date, and directing that the master, after the time for filing claims had expired, "state an account showing who are the bona fide creditors, the amounts of their respective debts, and any liens or priorities that may exist in favor of any of the creditors."

Among the defendants named in the original bill as creditors of Fry Brothers were the Universal Credit Company (hereinafter sometimes called Credit Company), a "non-resident" corporation, and Maury National Bank (hereinafter sometimes called the Bank), a corporation with its principal place of business at Columbia, Tenn., both of whom filed petitions in the cause, and this appeal involves a controversy between these two petitioners as to which of them "has a prior and superior right and title to a fund of $970 now in the hands of Mora B. Farris, receiver in this cause," which fund was realized from the sale by the receiver, under the orders of the court below, of five automobiles described in the record. The chancellor adjudged that the claims of the Bank to said fund were prior and superior to those of the Credit Company to the extent of $852.40, and that the Credit Company was entitled to the remainder of said fund, viz., $117.60; and upon this finding the chancellor decreed as follows:

"It is therefore, ordered, adjudged and decreed by the Court that the contestant Maury National Bank have and recover a judgment for the sum of $852.40, which is the amount of their prior or superior indebtedness, and that the Universal Credit Company have and recover judgment for the excess of $117.60 and the Receiver in this cause, Mora B. Fariss, is hereby directed to first deduct the proportionate part of the costs incident and alone to the contestants of this special fund pro rata the said costs in proportion to the amount received by each contestant and then he will pay the balance of the said fund on hand to the Maury National Bank and the Universal Credit Company, or their attorneys of record, as hereinbefore ordered and directed."

From the aforesaid judgment the Credit Company appealed to this court and has assigned errors here.

Presumably there was much of the record in the general creditors' suit that was not pertinent to the controversy between the Credit Company and the Bank involved in this appeal, and the clerk and master certified that the transcript sent to this court is "a true

and perfect transcript of the record designated by the attorneys in the above styled cause to be made up as the record to be passed upon by the court of appeals as the same appears of record and on file".in his office, "together with the original exhibits thereto."

A "written designation of each or all of the parties or solicitors" is not "transcribed as a part of the record" filed in this court, as provided by the Code (section 9058), but no complaint is made here by appellant or appellee that any "designated" part of the record is omitted; hence we will assume that all parts of the record relating to the issues of fact and law presented by the assignments of error in this court are included in the transcript filed here.

Fry Brothers (a corporation) was, for a number of years prior to and until October 9, 1931 (when the aforesaid general creditors' bill was filed), a dealer in automobiles, with its place of business in Columbia, Tenn. It had a deposit account with the Maury National Bank, and it is evident from the record that it transacted much of its banking business through that Bank.

The Credit Company is a corporation organized under the laws of the state of Delaware and authorized to do business in Tennessee, but with a "branch office" in the city of Louisville, Ky. All contracts made by the Credit Company, so far as such contracts are involved in this case, were made by and through its said branch office in Louisville, and all of its transactions growing out of or relating to said contracts were conducted either by its officers and agents at Louisville, or by its representatives at Columbia, acting under authority of said branch office at Louisville.

The full scope of the business of the Credit Company is not shown by the record, but it appears that it was engaged in the purchase from retail automobile dealers of "conditional sales contracts" executed by the sellers and purchasers of automobiles, and in doing the things incident to the collection of "deferred payments" due from the purchasers of such automobiles.

We see no occasion to extend this opinion by making a detailed statement of the proceedings below which resulted in the aforestated decree of the chancellor ordering the sale of the five automobiles in controversy. No one is here challenging the validity or propriety of the sale of said five automobiles by the receiver, and the fund of $970 realized from the sale remains in the registry of the court in lieu of the automobiles, and the question for decision here is, whether the Credit Company or the Bank had the better right and title thereto. It may be necessary to refer further to some parts of the pleadings in disposing of certain assignments of error.

The Credit Company claims the superior right and title to each of said five cars by virtue of the retention of title thereto to secure

certain specified "deferred payments" in a "conditional sale contract," executed by Fry Brothers, as the "seller," and by another, as the purchaser, and the assignment of said contract, for value, by Fry Brothers to the Credit Company.

The Bank claims the superior right and title to each of said five cars by virtue of the retention of title thereto in a note (or, in some instances, more than 1 note) executed by the purchaser of the car to Fry Brothers and transferred by Fry Brothers to the Maury National Bank by endorsement and delivery, and each of which notes recites among other things, in substance, that the maker is purchasing from Fry Brothers a described automobile, and that the title thereto "is and remains in said Fry Brothers until said unpaid part of the purchase price . . . is paid in full."

As each of the aforesaid five cars was the subject matter of a separate series of transactions, and the facts of each series of transactions are not in all respects parallel it will be necessary to make a separate statement with respect to the sale of each of the five cars by Fry Brothers and the subsequent transactions based, or purporting to be based, on such sale.

Each of the cars here in question was a "new" Ford car when sold by Fry Brothers and is identified in the record by the motor number. As a convenient means of identification they are frequently designated in the record and briefs by the respective names of the purchasers from Fry Brothers.

Hardison Car—Motor No. A3987525.

On January 26, 1931, Fry Brothers sold and delivered to S. R. Hardison, Jr., a new Ford Standard Coupe, Model A, Motor No. 3987525; and a "conditional sale contract," signed by the seller and purchaser, was executed on that date, which recited that the sale and delivery of the car by the seller to the purchaser was for $139.50 on or before delivery, leaving a deferred balance of $522, payable at the office of the Universal Credit Company, in 18 installments of $29 each on the same day of each successive month and commencing 1 month from the date of the contract, with interest thereon after maturity at the highest legal contract rate, and with a provision for an attorney's fee if placed with an attorney for collection.

The contract contains a provision (among others not necessary to mention at this time) that "title to said property shall not pass to the purchaser until all sums due under this contract are fully paid in cash."

Immediately following the aforesaid conditional sale contract, and on the same sheet of paper, Fry Brothers executed an instrument by which it sold, assigned, and transferred to the Universal Credit Company its right, title, and interest in and to said con-

ditional sale contract and the property covered thereby, and authorized the Universal Credit Company "to do every act and thing necessary to collect and discharge the same." And, further guaranteed payment of the full amount remaining unpaid on the contract.

Thereupon, on the same day (January 26, 1931), Fry Brothers enclosed the said conditional sale contract and the assignment thereof in a sealed envelope, on the outside of which was printed a form of draft and (by filling the blanks in said form and signing same) made a draft on the Universal Credit Company, Louisville, Ky., payable to Maury National Bank, for $445, and delivered same to the Maury National Bank, which credited Fry Brothers with the amount of same, and forwarded the envelope, with the draft thereon, through a correspondent bank or banks, to Universal Credit Company at Louisville, Ky., where it was paid by the Universal Credit Company on presentation to it.

The Universal Credit Company is the lawful owner and holder of said conditional sale contract; and the balance remaining unpaid thereon (as of October 24, 1932) is $377.

L. K. Denham, vice-president of Fry Brothers, testified, as a witness for the Bank, that, as salesman for Fry Brothers, he made the sale to Hardison of the car described in the aforesaid conditional sale contract; that he prepared and signed said contract and the assignment thereof and also prepared the draft on the Universal Credit Company; that the "price" of the new Ford Coupe sold to Hardison on January 26, 1931, was $584.50; that the consideration of $661.50 named in the conditional sale contract represented the cash price of the car, plus "brokerage," or "carrying charge," and "insurance;" that the payment of $139.50 on the Hardison car, acknowledged by Fry Brothers in the conditional sale contract, was not paid in "actual cash" but in its "equivalent" viz., the "equity" of Hardison in another car; that Fry Brothers "took in another car on which there was some indebtedness and gave him (Hardison) credit for his equity in that car;" that he did not remember the amount of the indebtedness of Hardison on the car received by Fry Brothers from Hardison in the trade, but that the notes on said car were held by the Middle Tennessee Bank; that, at the time Hardison executed the aforementioned conditional sale contract, he also executed a "title retention note" for $157.02, payable to Fry Brothers, which note was sold by Fry Brothers to the Maury National Bank and Fry Brothers got the proceeds. The witness Denham was asked if there was any consideration for the above-mentioned note of $157.02, and, if so, to explain what consideration, and he replied:

"There was a conditional sales contract, I sold the car, in fact, figured the transaction, it has been about two years ago and I

haven't refreshed my memory on it, I am afraid I can't figure out exactly how it was arrived at, to the best of my knowledge and belief the entire transaction covered one new Ford automobile, the figures hinge on the price of new car delivered at that time, amount of indebtedness on his old car that was traded in, and the appraised value of it."

Denham's testimony is the only evidence in the record which throws any light on the reason for the execution by Hardison of said note of $157.02; but we think it sufficiently appears from his testimony, when read in connection with the undisputed evidence with respect to the conditional sale contract executed contemporaneously with the note, that the note represented (in amount) the debt owing by Hardison on the "old car" traded by him to Fry Brothers. That is to say, the parties, after agreeing upon the estimated, or "appraised," value of Hardison's "old car," deducted therefrom the debt owing by Hardison on his old car, and in that manner arrived at the "equity" of Hardison therein, viz., $139.50, for which sum Fry Brothers gave Hardison credit as a down payment on the new car, and (in order to provide means of liquidating the debt to the Middle Tennessee Bank and thus disencumber the old car) the note for $157.02 was executed by Hardison to Fry Brothers.

The Maury National Bank is the owner and holder of a note for $102.84, dated July 24, 1931, due 90 days after its date, signed by S. R. Hardison, Jr., payable to Fry Brothers, and endorsed (in blank) by Fry Brothers, which note recites in the body thereof (among other recitals) that the maker is purchasing from the payee Ford Coupe, Motor No. A3987525 (which is the correct description of the Hardison car in controversy) and that "the title of said property is and remains in said Fry Brothers until said unpaid part of the purchase price, with all interest, costs, and indebtedness for labor, materials, supplies, or storage on same, existing at or prior to the maturity of this note, or any extension thereof, is paid in full."

It is the contention of the Bank that the note for $102.84 is a renewal pro tanto of a note for $127.84, dated April 25, 1931, and the last-mentioned note was a renewal pro tanto of the aforesaid note for $157.02 executed by S. R. Hardison, Jr., to Fry Brothers on January 26, 1931.

In support of its contention just stated, the Bank introduced and examined as a witness its "bookkeeper and note registrar," Leslie Clark, who did not claim to have any personal knowledge of the transactions through which any note or notes about which he testified had been acquired by the Bank or renewed by the maker, but he merely undertook to state what the "records" of the Bank showed with respect to the matters about which he was

interrogated. He testified, without objection, that his records show that the Bank purchased the note of $157.02 on *January 30, 1931;* that his record shows that said note was given for "a car," but does not show "what particular car;" that said note had been "renewed twice—first on April 25, 1931, and again on July 24, 1931—the last of the 2 renewal notes being the note of $102.84 now held by the Bank; that a payment was made at the time of each renewal—the two payments aggregating $44.18.

On request of the solicitor for the Bank, the witness Clark filed 3 purported copies of notes, which he stated were "true and correct" copies of said note for $157.02 and said two renewal notes, respectively; but, on cross-examination, this witness stated that he did not make the copy of the note for $157.02 from the original note, but "made it up from the books;" that "Mr. Chaffin" kept the books from which he made up said copy; that witness was not present when Mr. Chaffin made the entries and witness did not know whether he made them accurately or not; that witness did not know whether or not the Maury National Bank still owns and has in its possession "the note signed by S. R. Hardison, Jr., on January 26, 1931, for $157.02;" that the notes are in the possession of Mr. H. B. Cochran, and witness had told Mr. Cochran he wanted all the notes they had pertaining to this transaction; and Mr. Cochran had furnished him only the one dated July 24, 1931; that witness felt confident, from what Mr. Cochran gave him after witness made the request of him, that the Bank has no other notes signed by S. R. Hardison, Jr., than the one dated July 24, 1931 (for $102.84).

The Hardison car was taken from the possession of the original purchaser from Fry Brothers (S. R. Hardison, Jr.) by the receiver in this cause, and was sold by the receiver for $155. Of this sum the chancellor held that the Bank was entitled to the amount of the aforesaid note for $102.84, with interest from its date, July 24, 1931, to the date of the decree, viz., $13.77, making a total of $116.61, and that the Credit Company was entitled to the "excess" of $38.39.

The Credit Company insists that it is entitled to the entire proceeds of the Hardison car ($155), and, through its assignments of error, complains of the action of the chancellor in awarding $116.61 of said sum, or any part thereof, to the Maury National Bank.

The decision of the questions arising on this record requires an application of the rules of law governing conditional sales. "The typical case of conditional sale is a sale in which the transfer of title is conditional upon the payment of the price. Though sales upon other conditions may readily be imagined, the practice of selling goods with a retention of title until payment of the price is so common that the ordinary meaning of the term 'conditional

sale' is confined to sales upon this particular condition. In such sales the goods are habitually delivered to the buyer but the title retained by the seller until payment.'' Williston on Sales (2 Ed.), section 7, p. 10.

Conditional sale contracts may be drawn with the obligation to pay the balance of the purchase price contained in the same instrument as the reservation of title in the seller to secure the payment, or they may be made in separate instruments. When made in the same instrument, the assignment of the instrument as a whole carries with it the reservation of title to secure the balance of the purchase price, and the assignee may maintain replevin or other appropriate action thereon. When the obligation to pay the balance of the purchase price and the reservation of title to secure such payment are in separate instruments, both of them may be transferred by the seller to the same person so that the assignee may have the benefits of the reservation of title and bring an appropriate action in event of default. In states where the retention of title by the seller in a conditional sale of goods is a mere security for the payment of the price (as in Tennessee), the assignment of notes executed by the purchaser for the price vests in the assignee all the right, title, and interest of the vendor in the property, together with all the remedies conferred by law on the vendor. An assignment of a contract of sale of personal property, which contract retains title to the property but does not contain an obligation to pay, does not give the assignee a title to or interest in the property superior to the title and interest of an assignee of notes for the purchase price. National Bond & Investment Co. v. Evans, 118 Kan., 656, 658, 236 P., 447; Wright v. Batchelor Motor Co., 2 Tenn. App., 468, 474; 55 C. J., pp. 1330, 1331, section 1412; Estrich on Instalment Sales, section 232, p. 478; Waterbury Trust Co. v. Weisman, 94 Conn., 210, 217, 108 A., 550; State Bank of Black Diamond v. Johnson, 104 Wash., 550, 177 P., 340, 3 A. L. R., 235; Martin v. McAvoy, 130 Wash., 641, 644, 228 P., 694; Burrier v. Cunningham Piano Co., 135 Md., 135, 142, 108 A., 492.

It is the general rule that the taking of a renewal note for the purchase price of property conditionally sold, or a part of it, does not operate to devest the vendor, or his assignee, of his retained title, but (unless a contrary intention appears) is regarded as a mere extension of time of payment. Annotations, 13 A. L. R., pp. 1049, 1050, and 55 A. L. R., p. 1160; Estrich on Installment Sales, section 295, pp. 601, 602; McDonald Automobile Co. v. Bicknell, 129 Tenn., 493, 496, 167 S. W., 108, Ann. Cas., 1916A, 265.

''While there is some authority to the contrary, it is generally held, in the absence of statute providing otherwise, that conditional sales contracts are not negotiable instruments, do not

possess any of the attributes or qualities of such instruments, and cannot be made negotiable by agreement of the parties to the contract." 55 C. J., p. 1334, section 1417.

But they are assignable, and notice to the purchaser-debtor is not necessary to perfect the title and right of the assignee of the seller to enforce the contract. Code, section 7321; Smith v. Hubbard, 85 Tenn., 306, 312, 2 S. W., 569.

The negotiability of a note is not destroyed by the fact that it contains a clause merely providing for the retention of title to the property for which the note is given, until the note is paid. Such clause "is a distinct and independent agreement, incident to, but no part of, the note." It is collateral to the note, and does not affect its negotiability. W. W. Kimball Co. v. Mellon, 80 Wis., 133, 140, 48 N. W., 1100; note, 14 Ann. Cas., 1129, 1130; Marion Mfg. Co. v. Buchanan, 118 Tenn., 238, 251, 99 S. W., 984, 8 L. R. A. (N. S.), 590, 12 Ann. Cas., 707; Estrich on Instalment Sales, section 269; Chicago Railway-Equipment Co. v. Merchants' National Bank, 136 U. S., 268, 10 S. Ct., 999, 34 L. Ed., 349; annotation 28 A. L. R., 699.

But the note, in order to be negotiable, must be an unconditional promise to pay a sum certain in money, at a fixed or determinable future time (Code, section 7325); hence if the note contains a promise of the maker to do any other act (except such as the law would imply), it is not negotiable. Baxter v. Stewart, 4 Sneed, 213-215; Whiteman v. Childress, 6 Humph., 303, 305; Estrich on Instalment Sales, sections 271-273, pp. 548-558.

However, the fact that notes are executed in a series, payable at different times, and all to become due upon default in the payment of one, does not make the notes nonnegotiable. White v. Hatcher, 135 Tenn., 609, 188 S. W., 61.

We are of the opinion that the Hardison conditional sale contract, which was assigned as before stated by Fry Brothers to the Universal Credit Company, contains both an obligation to pay the balance of the purchase price and the retention in the seller of the title to the car therein described. We find further that the consideration of $661.50 shown by said conditional sale contract represented the entire purchase price of the new car therein described, plus an agreed sum for "brokerage" and "insurance," and that the said note for $157.02 did not represent any part of the price of the new car but was the amount of the debt owing by Hardison on his old car, as before stated.

The effort of Fry Brothers to retain title to the new car sold Hardison in order to secure the note of $157.02 was futile and unavailing against a bona fide transferee of the conditional sale contract. The attempted retention of title to the new car in said note for $157.02 was an effort to create a lien on the new car for

a debt owing by Hardison on his old car, and was an indirect method of lending Hardison $157.02 to disencumber the old car. The written assignment of the conditional sale contract by Fry Brothers to Universal Credit Company contains covenants as follows:

"The undersigned (Fry Brothers) certifies that said contract arose from the sale of the within described property, warranting that the title of said property was at the time of sale and is now vested in the undersigned free of all liens and encumbrances; that the said property is as represented to the purchaser of said property by the undersigned and that the statements made by the purchaser on the statement form attached hereto are true to the best of the knowledge and belief of the undersigned. Undersigned warrants that down payment made by purchaser as stated above was in cash and not its equivalent, unless written notice otherwise was given Universal Credit Company, and that no part thereof was loaned directly or indirectly by undersigned to purchaser. . . . Undersigned makes above representations and warranties for the purpose of inducing Universal Credit Company to purchase above contract."

Fry Brothers also guaranteed the full payment by Hardison of the deferred payments shown by contract.

While Fry Brothers held said note for $157.02, it could not successfully have asserted any rights superior to those of the Credit Company with respect to the Hardison car. Does the Maury National Bank stand on any higher ground than Fry Brothers?

The Hardison note for $157.02 and the two renewal notes are in precisely the same language, except the dates and amounts. It is stipulated in the note (among other things) that it "shall become immediately due and payable" if the maker "shall fail to fulfil any of the agreements" therein; and one of the "agreements" therein is that "undersigned (S. R. Hardison, Jr.) shall deliver to Fry Brothers a policy of insurance in a company satisfactory to Fry Brothers for not less than the amount due, insuring said purchaser against loss of or damage to said property by fire, theft or collision, with loss, if any, payable to Fry Brothers as its interests may appear, and shall keep said policy in force, pay all premiums and renewals thereon until the indebtedness evidenced hereby is paid in full."

This would seem to be a promise to do an act other than to pay a sum certain in money at a fixed or determinable future date, and that the nonperformance of which act, would, according to the terms of the note, render it immediately due and payable.

The note further provides that if the car "should be used for any illegal purpose," or if the payees "deem security insufficient," they or their agents may take possession of and remove said prop-

erty without legal process and sell same for cash, either publicly or privately, as they may think best, all payments made heretofore by the undersigned to be deemed as made for the use of said property during the time the same remained in his possession, and to be retained and kept by said Fry Brothers, as such payment.

It has been held that such stipulations in a note as those above set forth destroy its negotiability. Estrich on Instalment Sales, section 273, pp. 551, 552; Murrell v. Exchange Bank, 168 Ark., 645, 271 S. W., 21, 24, 44 A. L. R., 1391; Moyer v. Hyde, 35 Idaho, 161, 204 P., 1068, 28 A. L. R., 695; Kimpton v. Studebaker Brothers Co., 14 Idaho, 552, 94 P., 1039, 125 Am. St. Rep., 185, 14 Ann. Cas., 1126.

But, without deciding whether or not the Hardison note of $157.02 or the Hardison note of $102.84 now held by the Bank are in form negotiable instruments, we are of the opinion that, on this record, the Bank does not occupy the status of a holder of said notes in due course, and its rights with respect thereto are no greater than those of Fry Brothers prior to the time of the transfer of said note of $157.02 to the Bank.

Where there is substantial evidence that the title of the original holder of a note was defective, a later holder has the burden of proving that he took the note in good faith and for value, and that at the time the note was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it. Code, sections 7376, 7382, 7383; Security Finance Co. v. Duncan, 5 Tenn. App., 631, 634.

The Bank has not discharged the burden which thus rested upon it. Its witness Leslie Clark admitted that he had no personal knowledge of the acquisition of the note by the Bank, and that he did not make the original entries on the books about which he testified. He mentioned other officers of the Bank—Mr. Chaffin and Mr. Cochran—as having some connection with the transaction, but neither of these gentlemen testified, and their failure to do so is not explained.

There is a presumption that competent and pertinent evidence within the knowledge and control of a party and which he withholds is against his interest and insistence. Standard Oil Co. v. State, 117 Tenn., 618, 672, 100 S. W., 705, 10 L. R. A. (N. S.), 1015; Fisher v. Insurance Co., 124 Tenn., 450, 483, 138 S. W., 316, Ann. Cas., 1912D, 1246; Western Union Telegraph Co. v. Lamb, 140 Tenn., 107, 111, 203 S. W., 752; Citizens Bank v. Langford, 6 Tenn. App., 238, 242.

"Where it is apparent that a party has the power to produce evidence of a more explicit, direct and satisfactory character than that which he does introduce and relies on, it may be presumed that if the more satisfactory evidence had been given it would have been detrimental to him and would have laid open deficiencies in,

and objections to, his case which the more obscure and uncertain evidence did not disclose." 22 C. J., p. 115, section 55.

Upon the foregoing facts, we find that the Bank is not a holder of the Hardison note in due course, and that the Bank stands on no higher ground with respect to said note than does its assignor, Fry Brothers; hence, the right and title of the Credit Company in and to the Hardison car and the proceeds of the sale thereof are superior to those of the Bank, and the Credit Company's assignments of error, directed to that part of the chancellor's decree ruling otherwise, are sustained.

### Hill Car—Motor No. 4133917.

On March 30, 1931, Fry Brothers sold and delivered to W. M. Hill a new Ford Victory Coupe, Motor No. 4133917; and a "conditional sale contract," signed by the seller and purchaser, was executed on that date, which recited that the sale and delivery of said car by the seller to the purchaser was for $177.50 on or before delivery, leaving a deferred balance of $576, payable at the office of the Universal Credit Company, in 16 installments of $36 each on the same day of each successive month and commencing 1 month from the date of the contract, with interest thereon after maturity at the highest lawful contract rate, and with a provision for an attorney's fee if placed with an attorney for collection.

The contract contains (among others not necessary to mention at this time), a provision that "title to said property shall not pass to the purchaser until all sums due under this contract are fully paid in cash."

Immediately following the aforesaid conditional sale contract, and on the same sheet of paper, Fry Brothers executed an instrument whereby it sold, assigned, and transferred to the Universal Credit Company its right, title, and interest in and to said conditional sale contract and the property covered thereby, and authorized the Universal Credit Company "to do every act and thing necessary to collect and discharge the same," and, further, guaranteed payment of the full amount remaining unpaid on the contract.

Thereupon, on the same day (March 30, 1931) Fry Brothers enclosed the said conditional sale contract and assignment thereof in a sealed envelope, on the outside of which was printed a form of draft, and (by filling the blanks in said form and signing the same) made a draft on Universal Credit Company, Louisville, Ky., payable to Maury National Bank, for $497, and delivered same to the Maury National Bank, which credited Fry Brothers with the amount of the draft, and forwarded the envelope with the draft thereon, to Universal Credit Company, at Louisville, Ky., where the draft was paid by Universal Credit Company on presentation to it.

The Universal Credit Company is the lawful owner and holder of said contract; and the balance remaining unpaid thereon (as of October 24, 1932) is $504.

F. F. Crowley, branch manager of the Louisville, Ky., branch of the Universal Credit Company, testified that W. M. Hill surrendered said car on August 6, 1931, and "signed a voluntary surrender form at that time" known to the Credit Company as "Form #6." This witness was asked to "state if the Universal Credit Company, after it repossessed this automobile, advertised the same as required by Tennessee law," and he replied: "Not necessary where voluntary surrender form is signed."

L. K. Denham of Fry Brothers, testified that the Hill car was "repossessed" from Mr. Hill by "Galbreath" for Universal Credit Company in August, 1931, and "from that date" was in the possession of Universal Company; that (when repossessed) it was stored in Fry Brothers' garage and later on it was moved to a warehouse of H. G. Foster Company (in Columbia).

Mr. Denham testified that he did not make the sale to W. M. Hill, but that he "filled out the papers on the car;" that the "cash consideration" of $177.50 and the "deferred payment of $576" together represented the approximate value of the Victory Coupe sold to Hill on "the Universal Credit Company conditional sale plan;" that he had no recollection of preparing a note for W. M. Hill to sign at the time he prepared "this contract," that Hill "traded in a Ford Coupe" to Fry Brothers, and the Coupe was "not clear," but witness did not remember the amount owing on it.

Maury National Bank is the owner and holder of a note for $211.05, dated March 30, 1931, due 90 days after its date, signed by W. M. Hill, payable to Fry Brothers, and endorsed in blank by Fry Brothers, which note recites in the body thereof (among other recitals) that the undersigned maker is purchasing from Fry Brothers Ford Victory, Motor No. A—4133917 (which is the correct description of the Hill car in controversy), and that "the title of said property is and remains in said Fry Brothers until said unpaid part of the purchase price, with all interest, costs, indebtedness, materials, labor, supplies or storage on same existing at or prior to the maturity of this note, or any extension thereof is paid in full."

Leslie Clark, bookkeeper and note registrar of the Maury National Bank, testified that the Bank's records show that the Bank purchased said note of W. M. Hill on March 31, 1931, and that the amount of same ($211.05) was placed as a credit to the account of Fry Brothers on that day; that witness was not present when the note was purchased and "the transaction actually took place" but was testifying from the books of the Bank and the note in the

possession of the Bank. He filed a copy of the note as an exhibit to his testimony.

The Hill car was sold by the receiver for $200. The chancellor held that the Bank was entitled to all of the proceeds of this car as a payment pro tanto on said note of W. M. Hill for $211.05, which, with interest to the date of the decree, amounted to $243.79.

The consideration for the execution of the Hill note of $211.05 held by the Bank is not made clear by the proof, but, as we have seen, there is proof that the price named in the conditional sale contract assigned to the Universal Credit Company represented the purchase price of the car therein described, and that Hill "traded in" to Fry Brothers a Ford Coupe that was encumbered.

On March 30, 1931, Fry Brothers deposited in the Maury National Bank a draft on Universal Credit Company for the value of the Hill contract, with the contract attached, and received credit for the proceeds.

The assignment of the Hill contract by Fry Brothers to Universal Credit Company was in the same terms as the assignment of the Hardison contract hereinbefore set forth, and conveyed to the Credit Company all the right, title, and interest of Fry Brothers in the Hill car and in the deferred payments evidenced by the contract, and warranted that the title to the car was then vested in Fry Brothers free of all liens and encumbrances, and Fry Brothers, as the holder of the Hill note for $211.05, could not have maintained a claim in opposition to the claims of the Universal Credit Company after such assignment of the conditional sale contract. Such being the condition of Fry Brothers' title to the Hill note at the time Fry Brothers transferred said note to the Bank on March 31, 1931, the burden was on the Bank to prove that it took said note in good faith and without notice of any infirmity or defect in the title of Fry Brothers, or of any equities attaching to the note in the hands of Fry Brothers, and the Bank has wholly failed to discharge this burden.

The point is made on behalf of the Bank that the Credit Company waived its title to the Hill car by its failure to advertise and sell same within 10 days after it regained possession thereof, in accordance with the provisions of Shannon's Code, sections 3666-3669 (Code 1932, sections 7287-7291); but this contention cannot be sustained. The right to complain of the failure of the vendee (or its assignee) to advertise and sell is "confined by the statute to the original purchaser." Spence Drug Co. v. Liquid Carbonic Corporation, 166 Tenn., 544, 546, 64 S. W. (2d), 11, 12.

The assignments of error through which the Universal Credit Company complains of that part of the chancellor's decree awarding the proceeds of the Hill car to the Bank are sustained.

Rayburn Car—Motor No. 4124658.

On April 9, 1931, Fry Brothers sold and delivered to Jesse J. Rayburn a new Ford Standard Coupe, Motor No. 4124658; and a conditional sale contract, signed by the seller and purchaser, was executed on that date, which recited that the sale and delivery of said car by the seller to the purchaser was for $140.50 on or before delivery, leaving a deferred balance of $510, payable at the office of the Universal Credit Company, in 15 installments of $34 each on the same day of each successive month and commencing 1 month from the date of the contract, with interest thereon after maturity at the highest lawful contract rate, and with a provision for an attorney's fee if placed with an attorney for collection. By the terms of the contract, the seller retained the title to the property sold until all sums due under the contract are fully paid.

By an instrument on the same sheet of paper, Fry Brothers sold, assigned, and transferred its right, title, and interest in and to said contract and the property covered thereby to the Universal Credit Company, and guaranteed payment of the full amount remaining unpaid on the contract. On the same day (April 9, 1931), Fry Brothers enclosed said conditional sale contract and assignment thereof in a sealed envelope, on the outside of which was a form of draft, and (by filling the blanks in said form and signing same) made a draft on Universal Credit Company, Louisville, Ky., payable to Maury National Bank, for $444, and delivered same to the Maury National Bank, which credited Fry Brothers with the amount of the draft, and forwarded the envelope, with the draft thereon, through a correspondent bank or banks, to Universal Credit Company at Louisville, Ky., where the draft was paid by Universal Credit Company on presentation to it.

The Universal Credit Company is the lawful owner and holder of said contract; and the balance remaining unpaid thereon (as of October 24, 1932) is $374.

F. F. Crowley, branch manager of the Credit Company at Louisville, testified that the Rayburn car was replevined (from Rayburn) on October 15, 1931, but was "taken by the purchaser under a re-delivery bond and later delivered to the Clerk and Master (the receiver) and sold by him."

In his direct examination by the Bank's solicitor, L. K. Denham, vice-president of Fry Brothers, stated that he was familiar with the sale of the Ford automobile to J. J. Rayburn in April, 1931. He was asked "what became of one of the notes signed by Mr. Rayburn," and he replied: "One of the notes sold to Universal Credit Company and one of the notes sold to Maury National Bank." He also stated that, according to his record, the amount of the note sold Maury National Bank was $144.30.

The cross-examination of Mr. Denham disclosed such a marked vagueness of his "recollection" as to discredit his previous statement that he was "familiar with the sale of the Ford automobile to J. J. Rayburn." Denham's cross-examination with reference to the Rayburn car was as follows:

"Q. Mr. Denham, I ask you to look at a contract which was purported to be signed by Jesse J. Rayburn dated April 9, 1931, for one Ford standard coupe, 1931 model, motor number 4124658, and ask you if you prepared that contract? A. Yes, sir.

"Q. I will ask you if you also prepared the envelope in which it was sent away or deposited? A. Yes, sir.

"Q. Have you any personal recollection about that? A. Except I remember traded in an old car.

"Q. Are you certain about him trading in one? A. Yes, sir.

"Q. Isn't this the way about his old car, you had sold him, by you I mean Fry Brothers, a second hand car, coupe, and some few months after he had purchased it and while he still owed a considerable amount on it, approximately $200.00, didn't he come back complaining about the service he was getting out of his car and left it there and didn't you have a repair bill of about $68.00 or $70.00 accumulated on the fixing of this first coupe that Rayburn had and didn't you finally sell that car to some parties in Hickman County, without ever consulting Rayburn, by reason of his owing this repair bill and owing the notes and you never gave him one cent on his new Ford for it, I know the history about it? A. I don't remember the full particulars about it.

"Q. You sold it to a bootlegger in Hickman County? A. My recollection the old coupe was traded in, I won't swear to that positively.

"Q. Mr. Denham, when you prepared his contract as a matter of truth, did you receive $140.50? A. I don't remember positively.

"Q. Well you wouldn't have made that recitation in that unless you had received it in cash or the equivalent, would you? A. No, sir.

"Q. By its equivalent meaning something other than a note signed by Jesse J. Rayburn? A. Not necessarily, he had always been very good pay up to that time, I don't remember what the consideration was, but a trade in, as I remember it.

"Q. Do you have any recollection of why he would give his note for $144.30 in addition to paying you $140.50 in cash and signing the Universal Credit Company conditional sales contract of $510.00? A. How much cash?

"Q. $140.50? A. Probably the note represents that cash payment there then.

"Q. Then if that is true, you received no cash? A. No, sir except the old car.

"Q. Do you know positively now that you received anything in the way of a car or other merchandise? A. My recollection we did receive a car he had, a used car that he purchased there.

"Q. Then to your honest belief now is that the note of $144.30 due in 90 days signed by Jesse J. Rayburn represents what you recited as a cash consideration $140.50? A. That may be so.

"Q. What do you believe? A. That he probably had the old car and owed very nearly all it was worth and came back and traded it in."

The Maury National Bank is the owner and holder of a note for $144.30, dated July 8, 1931, due 90 days after its date, signed by J. J. Rayburn, payable to Fry Brothers, and endorsed, in blank, by Fry Brothers, which note recited in the body thereof (among other recitals) that the maker is purchasing from the payee Ford Standard Coupe Motor No. 4124658 (which is the correct description of the Rayburn car in controversy) and a retention of title in the same words as in the Hardison and Hill notes hereinbefore described.

It is claimed by the Bank that the said Rayburn note of July 8, 1931, is a renewal of a note for the same amount dated April 9, 1931, and that the last-mentioned note was purchased by the Bank from Fry Brothers on April 10, 1931.

Leslie Clark, the Bank's bookkeeper and note registrar, exhibited with his testimony purported copies of said 2 notes of April 9, 1931 and July 8, 1931, respectively; but, on cross-examination, he stated that only the copy of the note of July 8, 1931, was made from the original; that he made up the "copy" of the note of April 9, 1931, from a "memorandum" on the books kept by Mr. Chaffin and of which the witness had no personal knowledge.

The witness Clark testified further that Fry Brothers was credited on April 10, 1931, with the amount of said Rayburn note "just like it was any other credit, money or check;" that he supposed that such a transaction would be had with Mr. Cochran; that the drafts of Fry Brothers against Universal Credit Company would ordinarily come into the teller, Mr. Hughes or Mr. Maxwell, and go through Mr. Chaffin's hands; that witness had never received and handled any of the notes or conditional sale contracts asked about in his examination "when they were first brought to the Bank and sold or discounted to the Bank;" but that he had entered the notes on the note register as a "routine matter."

This witness said: There were two books, one book that kept the notes listed in numerical and one book listed in alphabetical and I kept the book alphabetically, but that is not the book I got this off of. Mr. Chaffin kept the other one." He was asked if he

compared the two books "to see whether they correspond or not," and he replied: "I did certain parts of it, but some things that his book has on it that mine doesn't have."

The Rayburn car was sold by the receiver for $200. Of this sum the chancellor held that the Bank was entitled to the amount of the aforesaid note for $144.30, with interest from its date, July 8, 1931, to the date of the decree, viz., $18.91, making a total of $163.21, and that the Credit Company was entitled to the "excess" of $36.79.

It is obvious that, after Fry Brothers assigned the contract for the sale of the Rayburn car to the Universal Credit Company on April 9, 1931, with the same warranties and guarantee contained in its written assignment as in its assignments of the Hardison and Hill contracts, supra, it could not successfully assert any claims under the note of Rayburn for $144.30 to the detriment or impairment of the right, title, and interest of the Universal Credit Company, under the Rayburn conditional sale contract. The Bank purchased the draft of Fry Brothers (with the Rayburn contract and the assignment thereof by Fry Brothers to Universal Credit Company attached) on April 9th, and thereafter, on April 10th, took an assignment of the Rayburn note for $144.30. If the Bank knew the facts of the transaction between Fry Brothers and Rayburn and knew the terms of the conditional sale contract and the assignment thereof by Fry Brothers to the Universal Credit Company, it took said Rayburn note of $144.30 subject to all infirmities with which the note was affected in the hands of Fry Brothers, and therefore "subject to the same defenses as if it were non-negotiable." Code, section 7382.

So far as the record shows, the Bank may have known all the material facts affecting the rights of the parties as before indicated. If it did not know these facts, the law imposed upon it the burden of proving such lack of knowledge. Code, section 7383. The inference from the failure of the officers or employees of the Bank who handled the transactions to testify is adverse to the Bank. See authorities cited, supra.

The assignments of error through which the Universal Credit Company complains of that part of the chancellor's decree awarding the major part, or any part, of the proceeds of the Rayburn car to the Bank, are sustained.

Bumpus-Irwin—Motor No. 4122061.

We have adopted a hyphenated name descriptive of this car for the reason that Fry Brothers first sold it to Bumpus and later sold (or attempted to sell) it to Irwin. The Credit Company holds the conditional sale contract executed by Bumpus, and the Bank holds a series of notes executed by Irwin.

On April 13, 1931, Fry Brothers sold and delivered to Guss Bum-

pus a new Ford Town Sedan, Model A. Motor No. 4122061; and a conditional sale contract, signed by the seller and purchaser, was executed on that date, which recited that the sale and delivery of that car by the seller to the purchaser was for $176.50 on or before delivery, leaving a deferred balance of $612, payable at the office of the Universal Credit Company, in 12 installments of $51 each on the same day of each successive month and commencing 1 month from the date of the contract, with interest thereon after maturity at the highest lawful contract rate, and with a provision for an attorney's fee if placed with an attorney for collection. By the terms of the contract the seller retained the title to the property sold until all sums due under the contract are fully paid.

By an instrument on the same sheet of paper, Fry Brothers sold, assigned, and transferred its right, title, and interest in and to said contract and the property covered thereby, to the Universal Credit Company, and guaranteed payment of the full amount remaining unpaid on the contract.

On the second day thereafter (April 15, 1931), Fry Brothers enclosed said conditional sale contract and the assignment thereof in a sealed envelope, on the outside of which was a form of draft, and (by filling the blanks in said form and signing same) made a draft on Universal Credit Company, Louisville, Ky., payable to Maury National Bank for $548, and delivered same to Maury National Bank, which credited Fry Brothers with the amount of the draft, and forwarded the envelope, with the draft thereon, through a correspondent bank or banks, to Universal Credit Company at Louisville, Ky., where the draft was paid by the Universal Credit Company upon presentation to it.

The Universal Credit Company is the owner and holder of said contract; and the balance remaining unpaid thereon (as of October 24, 1932) is $510.

The Maury National Bank is the holder of 12 notes for $38 each, signed by J. W. Irwin, Jr., payable to Fry Brothers, and endorsed in blank by Fry Brothers. Said notes are all dated July 6, 1931, and one of same matures on the 6th day of each successive month thereafter for 12 months, and each bears interest from its date until paid.

Each of said 12 notes recites in the body thereof (among other recitals) that the note signed (J. W. Irwin, Jr.) is purchasing from Fry Brothers (the payee) Town Sedan, Motor No. A—4122061 (which is the description of the car in the aforesaid contract of sale to Guss Bumpus), and that ''the title of said property is and remains in said Fry Brothers until said unpaid part of the purchase price, with all interest, costs and indebtedness for labor, materials, supplies or storage on same, existing at or prior to the maturity of this note, or any extension thereof is paid in full.''

It is also recited in each of said notes that "this is one of the series of notes of even date herewith numbered from 1 to ———— inclusive, aggregating in amount $————," and "it is agreed that all of said notes and interest thereon shall become immediately due and payable if any of them, or any interest thereon, be not paid when due."

A copy of each of the 12 notes was filed by Leslie Clark, note teller of the Maury National Bank, as exhibits to his deposition, and this witness testified that the Bank's records show that said 12 notes were purchased by the Bank on July 6, 1931, and the sum of $456 (the aggregate face value of the notes) was placed to the credit of Fry Brothers on that date.

It appears from the deposition of F. F. Crowley, manager of the Louisville branch of the Universal Credit Company, that Guss Bumpus wrote the Universal Credit Company on July 20, 1931 (14 days after the Irwin notes were executed) that he (Bumpus) "had surrendered this car to Fry Brothers for their disposal." This is the only evidence in the record as to how Fry Brothers regained possession of the Bumpus car.

L. K. Denham, vice-president of Fry Brothers, was briefly examined and cross-examined with reference to the Bumpus-Irwin car. In his direct examination, Mr. Denham stated that he remembered the car and its sale to Irwin, but he "did not recall the particulars of the sale;" that he thought this was the car originally bought by Guss Bumpus, but that he did not recall when it was placed in Fry Brothers' garage by Gus Bumpus; that it would be his "guess" that "this car was sold on or about July 6, 1931 to J. W. Erwin."

(In the depositions the name of the alleged purchaser of the car in question on July 6, 1931, is sometimes written "Irwin" and sometimes "Erwin.")

At the conclusion of the foregoing direct testimony of L. K. Denham, cross-examination was reserved by the solicitor for the Credit Company, and the witness was afterwards cross-examined, and, in his cross-examination, stated that he did not know who prepared the notes dated July 6, 1931, and signed by J. W. Irwin, Jr.; that he did not remember a car that was sold by Fry Brothers to Guss Bumpus; that the motor number of the Irwin car shows that it was "a car of that current year," a new car; that the total amount of the J. W. Irwin notes ($456) does not represent the price of a new Town Sedan; that the price of a Ford Sedan of 1931 model, when sold on payments of $38 each and 12 months time, would be "approximately $745 or $750;" that he had "no recollection whatever about who sold that car to Irwin; that Irwin was working for Fry Brothers at that time.

The deposition of J. W. Irwin, Jr., is in the record, and he states that he lives in Columbia, Tenn., and was employed by Fry Brothers in the years of 1930 and 1931; that he was a "collector" and "sold gasoline," and worked "in the parts room part of the time;" but his desposition is entirely devoid of any reference, either in questions or answers, to the car to which we have referred as the Bumpus-Irwin car, or to the purchase of a car by Bumpus or himself.

(This is one of the numerous, unexplained omissions of seemingly available evidence from this record.)

The Bumpus-Irwin car was sold by the receiver for $255. The chancellor held that the Bank was entitled to all of the proceeds of this car as a payment pro tanto on said 12 notes of J. W. Irwin, Jr., for $456, which, with interest to the date of the decree, amounted to $519.84.

The record facts which we have stated strongly suggest that the attempted sale of this car by Fry Brothers to its employee Irwin was not in good faith, but was fictitious. But however this may have been, we are of the opinion that it did not prejudice the rights of the Universal Credit Company, for the reason that when Fry Brothers attempted to sell the car to Irwin it had no title thereto and no right to sell it; hence the purported retention of title to the car in the notes executed by Irwin to Fry Brothers and transferred by the latter to the Bank was ineffective, nugatory, and void.

Fry Brothers had transferred all its right, title, and interest in the Bumpus car to the Universal Credit Company, and there is no evidence that the Universal Credit Company had authorized Fry Brothers to repossess and sell the car. The proof is that it did not know that Bumpus had returned the car to Fry Brothers until 14 days after the attempted sale to Irwin and the execution of the notes by Irwin and their transfer to the Bank.

The view we have indicated above has been held and applied in at least four cases from other jurisdictions wherein the essential facts were practically parallel with the facts of the instant case (if it be assumed that Irwin purchased the car in good faith). These cases are: State Bank of Black Diamond v. Johnson, 104 Wash., 550, 177 P., 340, 3 A. L. R., 235; C. I. T. Corporation v. First National Bank, 33 Ariz., 483, 266 P., 6; Commercial Credit Co. v. Neel, 91 Fla., 505, 107 So., 639; Lynn Morris Plan Co. v. Bordon, 251 Mass., 323, 146 N. E., 685.

Following the rulings in the above-stated cases, which we think sound, the assignments of error through which the Universal Credit Company complains of that part of the chancellor's decree awarding the proceeds of the Bumpus car to the Bank are sustained.

Haywood Car—Motor No. 3965385.

It is stipulated on the record that, on December 29, 1930, W. T. Haywood bought of Fry Brothers a Ford Tudor, 1930 Model, Motor No. 3965385, and that Fry Brothers transferred this contract immediately to the Universal Credit Company for a valuable consideration.

Further details of this transaction are disclosed by the record as follows: On December 29, 1930, a conditional sale contract was executed by Fry Brothers, as seller, and W. T. Haywood, as purchaser, by the terms of which Fry Brothers sold and delivered to W. T. Haywood a new Ford Tudor automobile, Model A, Motor No. 3965385, for $195 on or before delivery, leaving a deferred balance of $468, payable at the office of Universal Credit Company, in 18 installments of $39 each on the same day of each successive month and commencing 1 month from the date of the contract, with interest thereon after maturity at the highest lawful contract rate, and with a provision for an attorney's fee if placed with an attorney for collection.

Said contract contains (among others not necessary to mention at this time) a provision that "title to said property shall not pass to the purchaser until all sums due under this contract are fully paid in cash."

By an instrument on the same sheet of paper, Fry Brothers sold, assigned, and transferred its right, title, and interest in and to said contract and the property covered thereby to Universal Credit Company, and guaranteed payment of the full amount remaining unpaid on the contract.

On the next day thereafter (December 30, 1930), Fry Brothers enclosed said conditional sale contract and the assignment thereof in a sealed envelope, on the outside of which was a form of draft, and (by filling the blanks in said form and signing same) made a draft on the Universal Credit Company, Louisville, Ky., payable to Maury National Bank, for $394.50, and delivered same to Maury National Bank, which credited Fry Brothers with the amount of the draft, and forwarded the envelope, with the draft thereon, through a correspondent bank or banks, to Universal Credit Company at Louisville, Ky., where the draft was paid by Universal Credit Company on presentation to it. This draft recited on its face that it was "in purchase of papers enclosed herewith executed by W. T. Haywood."

The Universal Credit Company is the owner and holder of said contract; and the balance remaining unpaid thereon (as of October 24, 1932) is $273.

With reference to the Haywood car, F. F. Crowley, branch manager of Universal Credit Company at Louisville, was asked and answered (in his deposition taken upon interrogatories) as follows:

"Q. Please give the date that your records show when The Universal Credit Co. repossessed the automobile of W. T. Haywood, Ford Tudor 1930 Model, Motor Number 3965385. A. This car had been taken by Fry Brothers about August 19, 1931, according to my information, and Universal Credit Company's representative found it on Fry Brothers floor and took possession of it about September 9, 1931.

"Q. Please state if The Universal Credit Co. after they had repossessed this automobile of W. T. Haywood, advertised the same as required by Tennessee law, and who became the purchaser at the said sale; give the date, time and place of sale. A. Maury National Bank replevied this car from Universal Credit Company, and it was partially destroyed by fire, and later sold by Mora B. Fariss, Receiver.

"Q. Please state, if you know, whether W. T. Haywood executed a series of Notes to Fry Brothers corresponding with his contract exhibited as to amount but which series of notes were dated December 10, 1930. What do your records indicate on this? A. Our records do not so indicate, and I do not know."

The Maury National Bank is claiming a right and title to the Haywood car superior to that of the Universal Credit Company by virtue of the fact that it is the owner and holder of a note for $102.15, dated April 8, 1931, due 60 days after its date, signed by Wm. T. Haywood, payable to Fry Brothers, and endorsed in blank by Fry Brothers and reciting in the body thereof (among other recitals) that the "undersigned" (Wm. T. Haywood) is purchasing from Fry Brothers "Ford 2 door Sedan," Motor No. 3965385, which (assuming that "Ford 2 door Sedan" means the same as "Ford Tudor") is the same car described in the aforesaid conditional contract of December 29, 1930, between Fry Brothers and W. T. Haywood. Said note held by the Bank further provides "that the title of said property is and remains in said Fry Brothers until said unpaid part of the purchase price, with all interest, costs and indebtedness for labor, materials, supplies or storage on same, existing at or prior to the maturity of this note, or any extension thereof is paid in full."

It is claimed by the Bank that said Haywood note of April 8, 1931 is a renewal pro tanto of a note of said Haywood for $115, dated February 7, 1931, and that the last-mentioned note was a renewal of a note of said Haywood for $115, dated December 10, 1930, and purchased by the Bank from Fry Brothers on the day of its date. Leslie Clark, the Bank's bookkeeper and note registrar, filed, as exhibits to his deposition, purported copies of the last-mentioned 3 notes. These copies are on printed forms evidently prepared for and used by Fry Brothers, as the name of Fry Brothers, wherever it appears therein, is printed in bold type. In

the copy of the note of February 7, 1931 (of which the note now held by the Bank is a renewal) the motor number of the car described therein is A396535 (not 3965385). In the copy of the note of December 10, 1930 (of which the note of February 7, 1931 was a renewal), the motor number of the car was first typewritten as "A396535," but a line was drawn through this number and after it is written, with pen and ink, "A3965385."

We think it is manifest from the testimony of the witness Clark that the purported copies of the Haywood notes of December 10, 1930, and February 7, 1931, are not true copies in the sense that the copyist had before him the original notes, but were merely made up on forms from memoranda on the books of the Bank, which memoranda was not made by the witness and is not shown in the record. We quote from Leslie Clark's testimony (which quotation includes all of his testimony relating to the Haywood notes) as follows:

"Direct Examination by J. Shelby Coffey.

"Q. This is Leslie Clark? A. Yes.

"Q. Please state what connection if any, you have with the Maury National Bank? A. Bookkeeper and note registrar.

"Q. How long have you been keeping the note register at the Maury National Bank? A. Off and on for about six years, most of the time.

"Q. For the past two years have you been in exclusive charge of the note register? A. Well yes, except for time I would be out on vacation.

"Q. I will ask you to get the records there, I will ask you to refer to the original note register and state whether the Maury National Bank purchased from Fry Brothers a note retaining title in a Ford car against W. T. Haywood, and state when that note was first purchased and the amount of it? A. On December 10, 1930, we purchased note in the amount of $115.00.

"Q. Your records show that the Maury National Bank paid value received for that note? A. Yes.

"Cross-examined by Mr. Hopkins.

"Q. Leslie, does your note record there show the number of the car for which your $115.00 note was given? A. No, sir, this book doesn't show it.

"Q. Have you any record in this Bank which will disclose the number of the car? A. Not any I know of except the note itself.

"Q. Where is the note? A. I just couldn't say, I don't know.

"Q. Is the note paid off? A. No, sir, it stands on our books now as being reduced to $102.15.

"Q. Who has charge of that note in this Bank? A. Mr. Bruce Cochran.

"Q. Is it accessible to you tonight? A. No, sir.

"Q. Repeat the date of that note? A. December 10, 1930.

"Q. Read all—read the entire entry on your records there, please? A. December 10, 1930, endorser Fry Brothers, our number of the note 108,960, due date 2-7-1931, and the amount $115.00.

"Q. Please state the date of the renewals of said note? A. March 10, 1931 it was renewed and then again May 29, 1931, that was the last, as it stands now.

"Q. Has any legal effort been made by the Maury National Bank to collect this note? A. I don't know.

"Q. Is W. T. Haywood solvent? A. I don't know.

"Q. Has a judgment been obtained by the Maury National Bank against W. T. Haywood for this amount? A. I don't know.

"Q. Will you obtain a copy of the original note which you say was executed on December 10, 1930, and mark it as 'Exhibit #1' to your deposition? A. I will, if I can.

"Q. And I will ask you also to make exhibit also of each renewal of the original note and mark them 'Exhibits 2 and 3'? A. If I can I will.

"Q. Mr. Clark, I hand you here an exhibit to the testimony of F. F. Crowley in this cause, being the last sheet or exhibit that is attached to Mr. Crowley's deposition and being an envelope which was sent to The Universal Credit Company Inc., at 404 Martin Brown Building, Louisville, Ky., and which purported to be a draft drawn by the Maury National Bank for $394.50, dated December 30, 1930, and ask you what official or employee in the Maury National Bank handled that draft for Fry Brothers against The Universal Credit Company? A. Well for certain I couldn't say, but it would be the teller and I don't know which window it would come in or who might have been at that window.

"Mr. Coffey: For your information I will state that Mr. Chaffin handled all the drafts.

"A. Maybe I didn't have the right idea, I thought you meant who accepted it, of course, it goes through Mr. Chaffin's hands finally.

"Q. When this paper envelope was presented to the Maury National Bank, what did it contain, if anything? A. I don't know.

"Q. Was it sealed or unsealed? A. I don't know.

"Q. Did you ever see this one or similar papers presented to Fry Brothers through the Maury National Bank, envelopes of that kind? A. Yes, I have seen them, some.

"Q. Well can you tell in what condition with respect to being sealed or unsealed, the ones you saw that were presented? A. I couldn't say if they were sealed or not sealed.

"Q. Could you say whether or not they contained anything? A. No, I couldn't say.

"Q. Did you personally ever handle one of these drafts and send away one of the contracts of Fry Brothers written on Universal Credit Company contract form? A. Not that I remember, I am almost sure I didn't.

"Q. When you took a renewal in March, 1931, for your original note, did you surrender the original note? A. 1 don't know sir, I didn't take that, Mr. Cochran handled that.

"Q. Well do you know the general rule or habit of the Bank with respect to that question? A. In some instances they do and in some don't. . . .

"Re-direct Examination of Leslie Clark by Mr. Coffey.

"Q. Mr. Clark, Mr. Hopkins asked you yesterday in his cross-examination to file as exhibit to your proof certain notes testified to, and I first hand you a note of W. T. Haywood and ask you to state if you have a copy of the original note sold by Fry Brothers to the Maury National Bank, and if so state if that is a copy? A. Here is a copy of the original and two renewals.

"Q. Those are the copies of the original and renewals of the W. T. Haywood notes? A. Yes, sir.

"Q. The W. T. Haywood original note stated dated December 10, 1930, for 60 days started with $115.00? A. Yes, sir.

"Q. The last note—last renewals was April 8, 1931, due in 60 days for $102.15, the difference was paid to the Bank as shown by your book? A. Yes, sir.

"Q. Now, Mr. Clark, does your book show that the $115.00 was credited to the account of Fry Brothers on December 10, 1930? A. Yes, sir.

"Q. For the W. T. Haywood note? A. Yes, sir.

"Cross-examined by R. S. Hopkins.

"Q. In making your first and second notes of W. T. Haywood here, did you copy from the original notes or did you copy from memorandums in your books at the Bank? A. I copied from the books.

"Q. Have you the original notes or do you know? A. I don't know.

"Q. Who made the entries in the book that you copied from? A. Mr. Chaffin.

"Q. Of course, you don't mean to say that Mr. Chaffin made correct entries? A. I presume that he did.

"Q. I am asking you if you know he made correct entries? A. Well absolutely I don't know, he might make a mistake like me.

"Q. Mr. Clark, when you state that Fry Brothers was credited with $115.00 on December 10, 1930, in what way were they credited, on what they owed there or were they given new or fresh money credit? A. It was put to their account.

"Q. You still don't make it plain to me, was their indebtedness to the bank given credit or were they given credit for that much, were they given credit as having deposited fresh or new money? A. Given credit themselves same effect as of depositing money.

"Q. Same as if they had deposited money? A. Yes, sir.

"Q. How much were they given credit for? A. $115.00—I don't know whether any interest taken off.

"Q. What does your book show they were given credit for there at the bank? A. I can't say.

"Q. Did you examine the books to see how the entries were made today? A. Only credited to their account.

"Q. Well have you no recollection of what the amount was that was credited to their account? A. No sir.

"Q. Did your books show that they were actually credited on December 10th, 1930, or sometime after December 10, 1930? A. On December 10th, 1930.

"Q. Did you make inquiry from some official of the Bank, Mr. Cochran, or any one else as to whether or not the original note which was dated December 10, 1930, was still in the possession of the bank? A. No, sir.

"Q. You did not find it attached to the note which you now have here with Haywood's signature to it, dated April 8, 1931, did you? A. No, sir.

"Q. So far as you know and are able to state the note dated April 8, 1931, for $102.15 signed by W. T. Haywood was the only note that the bank now has against W. T. Haywood? A. As far as I know, yes, sir.

"Q. Who furnished to you the note of April 8, 1931? A. Mr. Cochran.

"Q. What relation to the Bank does Mr. Cochran bear? A. He is Cashier.

"Q. And as Cashier has charge of the notes? A. Yes, sir.

"Q. Did you make known to Mr. Cochran that you had been called upon in giving this deposition to furnish a copy of the original notes and also to furnish the original notes for the purpose of examination, if you had them? A. I don't know as I said those exact words, I told him you wanted me to make copies of the notes of these parties and that is all the notes he gave me.

"Q. Didn't you make known to him that you wanted to verify your copies by seeing the originals? A. I don't remember about that.

"Q. Didn't you understand yesterday that request was made of you, while on the witness stand? A. Yes, sir.

"Q Are you sure whether or not you made it plain to Mr. Cochran that you did want all of those or not? A. I think I did.

"Q. Did he make any explanation to you or make any explanation with reference to whether this was the only note, I mean the note signed by Haywood as of April 8, 1931, was the only note you all had signed by Haywood? A. He didn't say.

"Q. At any rate, that is the only note he furnished you on the request that you made? A. Yes, sir.

"Q. And you think you formulated your request to comply with the request made to you on cross-examination? A. Yes, sir."

With reference to the Haywood note of December 10, 1930, we quote from the testimony of L. K. Denham, vice-president of Fry Brothers, as follows:

"Q. Mr. Denham, there is an exhibit to the deposition of Leslie Clark a note dated December 10, 1930, which was given for, purported to be given by W. T. Haywood to Fry Brothers for the purchase of a Ford 2 door sedan motor number 3965285, I believe that is the same motor number recited in The Universal Credit Company conditional sales contract? A. Yes, sir.

"Q. Can you explain why a note was given on that same car 19 days before the contract was signed to Fry Brothers on The Universal Credit Company conditional sales form? A. No, sir, I thought about it last night and intended looking it up today but didn't get a chance to do it.

"Q. Mr. Denham, isn't this the way those things were worked with Haywood and others in the taxi business, Fry Brothers did all of their repair work, didn't they? A. Most of them did their own work. . . .

"Q. Then as I understand you have no explanation to make about the discrepancy of the date of the conditional sales contract of December 30th, 1930, and the note describing the same car as the conditional sales contract dated December 10, 1930? A. No, sir.

"Q. Nor can you account or explain why a 2 door 1930 model Ford Sedan should cost $195.00 plus $468.00 plus $115.00, can you? A. Looks like awful high carrying charge.

"Q. As a matter of truth you know that the car didn't sell for that amount of money, don't you? A. No, sir, it didn't sell for that much money I know, I think that would come about by small equities in traded in car."

The remaining evidence with respect to the Haywood car is the testimony of W. T. Haywood, who was examined as a witness on behalf of the Bank. He was in the "taxi business" in Columbia for about 3 years, ending in the latter half of 1931. During that period he had three cars, viz.: "Two 2-door cars and one four door." He bought the first "2 door" from Fry Brothers about the last of November or first of December, 1929, and the last "two-door" car was the car here in question. He stated that he had

"two at once;" that he "traded the first car on the last one;" that he "had a four-door in between them" which he turned in to Fry Brothers, but not on another car; that the last 2-door car (the car in question) was taken away from him by the Universal Credit Company; that Mr. Galbreath (representing the Credit Company) and Mr. Carlton Fry came to his house and said they wanted the car, and witness drove it down to Fry Brothers' garage for them and gave Mr. Galbreath the keys; that he thought this was in July, 1931; that this car was not advertised and sold to his knowledge; that he signed some kind of a paper with Mr. Galbreath which said he (Haywood) was to get all the car brought over what he owed on it; that he had owed the Maury National Bank a note for "something over a hundred" but that it had been renewed and some paid on it, and about $102 is unpaid; that he did not remember Fry Brothers selling any notes to the Maury National Bank; that the Commerce-Union Bank "handled the first 2-door and The Universal Credit Company the last 2-door."

Haywood stated further that he did not remember what he got for his old 2-door sedan or what kind of a trade he made with Fry Brothers when he traded for the new 2-door sedan; that he "imagined" he gave "something around $600" for the new 2-door sedan; that his old 2-door sedan was not paid for in full when he "traded it in;" that he did not remember how much he owed on it, but that he got a credit for it on the new car of "something close to $200;" that the $195 plus $468 (recited in the conditional sale contract of December 29, 1930) was about what the second 2-door sedan cost him, with "carrying charges and insurance;" that he did not remember giving any note on the contract on this car (the car in question) except to the Universal Credit Company.

There is an entire absence of any evidence in the record that Fry Brothers sold the car known in the record as the Haywood car (Motor No. 3965385) on *December 10, 1930*, or at any time prior to the conditional sale contract of December 29, 1930, now held by Universal Credit Company, unless it can be inferred from the "copy" of note of December 10, 1930, filed by the witness Leslie Clark as before stated.

The Haywood car was sold by the receiver for $160. Of this sum the chancellor held that the Bank was entitled to the amount of the aforesaid note for $102.15, with interest from its date, April 8, 1931, to the date of the decree, viz., $15.43, making a total of $117.58, and that the Credit Company was entitled to the "excess" of $42.42.

The copies of the Haywood note of December 10, 1930, and the renewals thereof, exhibited and filed by the witness Leslie Clark, together with Clark's testimony that the Bank bought the note for $115 on December 10, 1930, were admitted without ob-

jection. The note bears upon its face the recital that the maker (Wm. T. Haywood) is purchasing from Fry Brothers a Ford 2-door sedan, Motor No. A3965385, and that the title of said property is and remains in said Fry Brothers until the note is paid, etc. The note is prima facie evidence of a conditional sale of the car therein described on the day it bears date, and,. as this note was indorsed and transferred, for value, by Fry Brothers to the Bank, 19 days before the execution of the contract under which the Universal Credit Company is claiming title to the Haywood car, we are of the opinion that the claim of the Bank to the proceeds of the Haywood car (to the extent of its note, with interest) is superior to the claim of the Universal Credit Company; and the assignments of error through which the Universal Credit Company complains of that part of the chancellor's decree awarding $117.58 out of the proceeds of the Haywood car to the Bank are overruled.

Through its first and second assignments of error the appellant complains of certain matters of practice which we do not think affected the merits of the case, and these assignments are overruled. Through its twelfth assignment of error the appellant complains of the chancellor's adjudication of the costs. This is ordinarily a matter resting in the sound, legal discretion of the chancellor, and this assignment is overruled.

But, for the errors pointed out by the assignments of error hereinbefore sustained, the decree of the chancery court is so far modified as to adjudge that the claims of the Universal Credit Company in and to the fund of $970 representing the proceeds of the five automobiles in controversy are prior and superior to those of the Maury National Bank to the extent of $852.42, and that the Bank is entitled to the remainder of said fund, viz., $117.58 (representing its claim against the Haywood car), and a decree will be entered accordingly, and the cause will be remanded to the chancery court of Maury county for the distribution of said fund of $970 in conformity with the opinion and decree of this court.

The costs of the appeal will be adjudged against the Maury National Bank.

Crownover and De Witt, JJ., concur.

On Petition for Rehearing.

FAW, P. J. The appellee, Maury National Bank, has filed a petition asking this court to reconsider its opinion heretofore filed, set aside its decree heretofore rendered, rehear the case, and affirm the decree of the chancellor.

The case involves a controversy between the Universal Credit Company and the Maury National Bank—both of whom are petitioners in a general creditors' proceeding in the chancery court of Maury county—as to which of them has the prior and superior right and title to a fund of $970 in the hands of Mora B. Farris,

receiver, which fund was realized from the sale by the receiver, under the orders of the court below, of five automobiles described in the record. The chancellor adjudged that the claims of the Bank to said fund were prior and superior to those of the Universal Credit Company to the extent of $852.40, and that the Credit Company was entitled to the remainder of said fund, viz., $117.60.

The Universal Credit Company appealed and assigned errors, and this court sustained certain of the assignments of error and, in part, reversed the decree of the learned chancellor and adjudged and decreed that the claims of the Universal Credit Company in and to the fund of $970, representing the proceeds of five automobiles in controversy, are prior and superior to those of the Maury National Bank, to the extent of $852.42, and that the Bank is entitled to the remainder of said fund, viz., $117.58 (representing its claim against the automobile known in the record as the Haywood car).

It is insisted for the petitioner that the Universal Credit Company "has absolutely no claim of any nature or kind" in and to the automobile known in the record as the "Hardison car," for the reason that on the back of the original conditional sale contract for said car the following appears:

"Assignment. September 10, 1931. For value received the undersigned hereby sells, assigns and transfers to Commerce Union Bank all the right, title and interest in and to the within contract and the property described therein.

"Universal Credit Company
"By H. E. C. Williams
"Asst. Treas."

This endorsement on the Hardison contract was observed by this court prior to our former opinion and decree, but, in the light of the stipulations and proof in the record, we did not then, and do not now, regard it as of any controlling importance. Counsel for the Bank did not call attention to it in their brief, and we likewise omitted any reference to it in our opinion.

It is stipulated in the record, with respect to the S. R. Hardison, Jr., contract (on which said endorsement appears) as follows:

"Its (it is) stipulated that on January 26, 1931, S. R. Hardison, Jr., bought of Fry Brothers, of Columbia, Tennessee, a New Ford Standard Coupe, Model A, Motor #3987525.

"Its further agreed that Fry Brothers transferred this contract to the Universal Credit Company immediately, for a valuable consideration.

"Its agreed that the Contract of S. R. Hardison, Jr., signed on January 26, 1931, is attached hereto, and may be considered as a part of this deposition as fully as if copied herein.

"And its further agreed that this contract was transferred from Columbia, Tennessee, by or through the Maury National Bank, and that a draft accompanied said Contract, and that the Maury National Bank received the money on said draft, having permitted Fry Brothers to deposit said draft to the credit of it.

"And its further agreed that the envelope attached hereto, endorsed as follows: 'Pay to the order of any bank or banker. All prior endorsements guaranteed. January 26, 1931. Maury National Bank. 87-85 Columbia, Tennessee, 87-85,' is the envelope and draft which accompanied said Contract."

The contract described in the above-quoted stipulation was produced by F. F. Crowley, branch manager of the Louisville branch of the Universal Credit Company, and was filed by him as an exhibit to his deposition, and he testified that "Universal Credit Company is the owner of this Conditional Sales Contract at this time."

This testimony of the witness Crowley is undisputed, and there is no suggestion in the record that the Commerce Union Bank, or any one other than the Universal Credit Company, is claiming to be the owner or holder of said Hardison contract.

Upon the foregoing stipulated and proven facts, and in the absence of any evidence of delivery to the Commerce Union Bank, the presumption is that the endorsement was placed on the contract in contemplation of a transfer that was never effectuated by delivery.

"A delivery of a bill or note is necessary to its transfer whether by endorsement or otherwise. So a note may be endorsed by the payee, yet if not delivered to some one as endorsee or holder, the title remains in the payee who still is its holder, and no contract whatever from such endorsement is created or implied." 3 R. C. L., p. 967, par. 175.

The remainder of the Bank's petition for a rehearing deals with matters concerning which our findings of fact and conclusions of law were fully set forth in our written opinion heretofore filed and to which, on reconsideration, we are constrained to adhere. A statement of our views would, therefore, be a mere repetition of our former opinion, which, of course, is unnecessary.

However, we would suggest that the petition indicates that its draftsman misconceived the holding of this court on at least one important point in the case. It is said in the petition that: "The Court will bear in mind that the undisputed proof is that the appellee, Maury National Bank, purchased the notes in question for value received in due course of trade before maturity without any knowledge of any character or kind as to any alleged former title contract."

The excerpt just quoted from the Bank's petition is in direct conflict with the holding in our former opinion, wherein we said:

"We are of the opinion that, on this record, the Bank does not occupy the status of a holder of said notes in due course, and its rights with respect thereto are no greater than those of Fry Brothers prior to the time of the transfer of said note of $157.02 to the Bank.

"Where there is substantial evidence that the title of the original holder of a note was defective, a later holder has the burden of proving that he took the note in good faith and for value, and that at the time the note was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it. Code, sections 7376, 7382, 7383; Security Finance Co. v. Duncan, 5 Tenn. App., 631, 634.

"The Bank has not discharged the burden which thus rested upon it. Its witness, Leslie Clark, admitted that he had no personal knowledge of the acquisition of the note by the Bank, and that he did not make the original entries on the books about which he testified. He mentioned other officers of the Bank—Mr. Chaffin and Mr. Cochran—as having some connection with the transaction, but neither of these gentlemen testified, and their failure to do so is not explained.

"There is a presumption that competent and pertinent evidence within the knowledge and control of a party and which he withholds is against his interest and insistence. Standard Oil Co. v. State, 117 Tenn., 618, 672, 100 S. W., 705, 10 L. R. A. (N. S.), 1015; Fisher v. Insurance Co., 124 Tenn., 450, 483, 138 S. W., 316, Ann. Cas., 1912D, 1246; Western Union Telegraph Co. v. Lamb, 140 Tenn., 107, 111, 203 S. W., 752; Citizens Bank v. Langford, 6 Tenn. App., 238, 242.

" 'Where it is apparent that a party has the power to produce evidence of a more explicit, direct and satisfactory character than that which he does introduce and relies on, it may be presumed that if the more satisfactory evidence had been given it would have been detrimental to him and would have laid open deficiencies in, and objections to, his case which the more obscure and uncertain evidence did not disclose.' 22 C. J., p. 115, section 55.

"Upon the foregoing facts, we find that the Bank is not a holder of the Hardison note in due course, and that the Bank stands on no higher ground with respect to said note than does its assignor, Fry Brothers; hence, the right and title of the Credit Co. in and to the Hardison car and the proceeds of the sale thereof are superior to those of the Bank, and the Credit Company's assignments of error directed to that part of the Chancellor's decree ruling otherwise, are sustained."

Similar rulings were made with reference to the notes for the other cars in controversy, except the Haywood car.

The Bank's petition for a rehearing is overruled and denied.

The Universal Credit Company has filed a petition for a rehearing of the action of this court in overruling its twelfth assignment of error, which assignment challenged the chancellor's adjudication of certain costs against the 'Universal Credit Company.

The former opinion of this court was filed on July 22, 1935. The Bank's petition for a rehearing was filed on July 26, 1935, and thereafter counsel procured the transcript of the record and withheld it until November 8, 1935, when it was returned to the court and the Universal Credit Company's petition for a rehearing was filed on the latter date.

Rule 22 of the published rules of this court require that petitions for a rehearing and for other and additional findings of fact in any case must be filed within 10 days after the opinion of the court is filed. See Williams Annotated Code, vol. 7, p. 552. It is too obvious to need comment that a petition for a rehearing filed more than 3 months after the opinion was filed cannot be considered, and the said petition of the Universal Credit Company is also overruled and denied.

The costs incident to each of said petitions will be taxed to the respective petitioners.

Crownover and De Witt, JJ., concur.